<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| AMBROSE HARRIS, | | |
| | Petitioner, | Civ. No. 05-4858 (AET) |
| v. | | **O P I N I O N** |
| RONALD H. CATHEL, | | |
| | Respondent. | |

*Appearances by:*

Carl J. Herman, Esq.
443 Northfield Avenue
West Orange, NJ   07052

Office of the New Jersey Public Defender
Appellate Section
31 Clinton Street, 9th floor
P.O. Box 46003
Newark, NJ   07101
*by:*   James K. Smith, Jr., Esq.

   *Counsel for Petitioner*

Office of the Attorney General of New Jersey
Division of Criminal Justice, Appellate Section
P.O. Box 086
Trenton, NJ   08625
*by:*   Daniel I. Bornstein, Esq.

   *Counsel for Respondent*

**THOMPSON, Senior District Judge**

Ambrose Harris, an inmate at the New Jersey State Prison, has petitioned for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  Harris asserts that the writ should be granted because his Sixth Amendment rights to a fair trial and effective assistance of counsel were violated during his prosecution in state court.  The Attorney General for the State of New Jersey, on behalf of the Warden of the New Jersey State Prison, opposes Harris's petition.  Because Harris has not established that any of the New Jersey Supreme Court's conclusions were contrary to, or an unreasonable application of, United States Supreme Court precedent, his petition for a Writ of Habeas Corpus will be denied with prejudice and denies a certificate of appealability.

## I.  BACKGROUND

In 1996, Harris was convicted of the murder of Kristen Huggins.  A jury found that on December 17, 1992, Harris, along with Gloria Dunn, abducted Huggins, a 22 year old local artist, from the parking lot of the Trenton Club in Trenton, New Jersey.  According to Dunn's testimony at trial, Harris forced Huggins into the trunk of her car and drove her to an isolated area where he proceeded to rape her.  Harris then shot Huggins twice in the head and buried her body.  Harris was also convicted of, *inter alia*, kidnapping, robbery, and aggravated sexual assault.  He was sentenced to death for Huggins' murder; an extended term of life imprisonment for the aggravated sexual assault; and a total of 55 years in prison for his other crimes.

Harris appealed his state court convictions as of right, arguing that he had been denied a fair trial because the trial court did not take strong measures to ensure that his trial was free from the influence of prejudicial publicity in the media.  Specifically, he argued that the trial court

should have granted his Motion for a Change of Venue and that, during the trial, the trial court

should have questioned the jurors–individually–about their media exposure regarding this case.

The New Jersey Supreme Court found that the trial court's decision to impanel a foreign jury

rather than order a change of venue, and the general questioning of the jurors throughout the trial,

was sufficient to ensure that Harris's trial was free of improper influences.  State v. Harris, 716

A.2d 458, 463 (N.J. 1998) (hereinafter "Harris I").[1]

Harris then filed a motion for post-conviction relief ("PCR") arguing, among other things,

that he had been denied effective assistance of counsel during his criminal trial.  Because

statements made by the PCR court suggested that it had abdicated its role in the PCR review

process, the New Jersey Supreme Court disregarded the PCR court's findings and conclusions

and conducted a de novo review of Harris's claims for relief.  State v. Harris, 859 A.2d 364, 377,

380 (N.J. 2004) (hereinafter "Harris III").  Using New Jersey's version of the two-part Strickland

v. Washington[2] test, the New Jersey Supreme Court concluded that Harris had failed to

demonstrate ineffective assistance of counsel or any other grounds for relief.  Finding no grounds

---

[1] In a proportionality review, the New Jersey Supreme Court also found that Harris's death sentence was not disproportionate, aberrational, or resulting from impermissible influences.  State v. Harris, 757 A.2d 221 (N.J. 2000).  The Supreme Court of the United States denied Harris's petition for certiorari review of the New Jersey Supreme Court's decisions. Harris v. New Jersey, 532 U.S. 1057 (2001).

[2] Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a habeas petitioner must show that his counsel's representation fell below an objective standard of reasonableness, id. at 688, and that he was prejudiced by his counsel's deficient performance, id. at 694. Prejudice is established by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id.  When assessing ineffectiveness claims, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" so as to not "second-guess counsel's assistance after conviction."  Id. at 689.

for relief, the New Jersey Supreme Court denied Harris's application for post-conviction relief.

Harris III, 859 A.2d at 449.[3]

Harris timely filed his § 2254 petition before this Court on October 11, 2005, seeking

relief on at least eleven different grounds.  The matter was subsequently held in abeyance to

allow the New Jersey state courts to consider a second request for post-conviction relief on

grounds governed by state law which Harris filed concurrently with his § 2254 petition.[4]  On

December 16, 2007, following New Jersey's abolition of the death penalty, Governor Jon S.

Corzine commuted Harris's death sentence to a sentence of life imprisonment without parole.

Harris concedes that the change in his sentence has rendered a number of his grounds for relief

moot; however, he continues to pursue five grounds for relief that are unrelated to his death

sentence.

## II.  DISCUSSION

Harris's five remaining grounds for relief all flow from the Sixth Amendment's guarantee

of a fair trial.[5]  In his § 2254 petition, Harris argues that his right to a fair trail was violated

because his jury was prejudiced by the local media; that strong measures were not taken to ensure

[3] The Supreme Court of the United States denied Harris's petition for certiorari review of the New Jersey Supreme Court's decision on Harris's PCR application.  Harris v. New Jersey, 545 U.S. 1145 (2005).

[4] The New Jersey Supreme Court denied Harris's second request for relief on December 4, 2007.  See State v. Harris, 943 A.2d 835 (N.J. 2007).

[5] The Sixth Amendment, made applicable to the States through the due process clause of the Fourteenth Amendment, see Duncan v. Louisiana, 391 U.S. 145, 149 (1968), grants criminal defendants the "right to a speedy and public trial, by an impartial jury . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.

that jurors remained impartial throughout the trial; that a former public defender, who was seen

talking to the jurors, may have influenced the jury; that he was prevented from presenting

evidence in his defense; and that he did not receive effective assistance of counsel.  None of

these arguments, however, establish that Harris was erroneously deprived of his constitutional

rights to a fair trial by the New Jersey courts.

## A.   The Antiterrorism and Effective Death Penalty Act

This Court's review of Harris's § 2254 petition is governed by the terms of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110

Stat. 1214 (1996).  Under AEDPA, a habeas petitioner must "'fairly present' all federal claims to

the highest state court before bringing them in federal court," Stevens v. Del. Corr. Ctr., 295 F.3d

361, 369 (3d Cir. 2002) (quoting Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002)), because a

federal court may not grant a Writ of Habeas Corpus under § 2254 unless the petitioner has

"exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b)(1)(A).

When a ground for relief has been considered on the merits by the state court, federal

review under AEDPA is very limited.[6]  Habeas relief may only be granted if the state court

decision is either contrary to, or is an unreasonable application of, clearly established Supreme

Court precedent.  28 U.S.C. § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Habeas relief may also be granted if the state proceedings "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2).  Habeas relief may not be granted "simply because [the

---

[6] The Court reviews de novo issues that the state court did not decide on the merits.
Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002).

court] disagree[s] with the state court's decision or because [this court] would have reached a different result if left to [its] own devices." Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).

A state court decision is "contrary to" clearly established federal law if it is "substantially different" from Supreme Court precedent. Appel v. Horn, 250 F.3d 203, 209 (3d Cir. 2001) (quoting Williams, 529 U.S. at 405). A state court's factual findings are "presumed to be correct," and the habeas petitioner carries the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). An "unreasonable application" of Supreme Court precedent results when the state court "identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts"; "unreasonably extends a legal principle . . . to a new context where it should not apply"; or "unreasonably refuses to extend [a] principle to a new context where it should apply." Appel, 250 F.3d at 209 (quoting Williams, 529 U.S. at 407). Accordingly, habeas relief should not be granted "unless the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot . . . be justified under existing Supreme Court precedent." Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004).

## B.  Use of a Foreign Jury

Harris argues that he was denied his Fourteenth Amendment right to due process and his Sixth Amendment right to a fair trial by an impartial jury because the state trial court denied Harris's request for a change of venue. Harris's trial was set to be held in the Mercer County Superior Court in Trenton, New Jersey. The Huggins murder was extensively covered by local news media, including the local newspapers, the Trenton Times and the Trentonian. Articles published in the three years before Harris's trial expressed the view that Harris was responsible

for Huggins's death, encouraged the jury to sentence him to death, and contained other

information, such as Harris's criminal record, that would not have been admissible at trial under

New Jersey's rules of evidence.  Indeed, the trial court remarked that the content and the editorial

position of the Trentonian treated Harris more as the target of a vengeance-seeking crusade than

as the subject of a news story.

On a Motion for Change of Venue, the trial court found that the press coverage was

prejudicial.  However, the trial court denied Harris's request for a change of venue on the

grounds that all of the witnesses were from Mercer County.  Instead, the trial court granted

Harris's alternative request to impanel a foreign jury, finding that a jury from neighboring

Burlington County[7] would be able to give Harris a fair trial.  On Harris's direct appeal of his

sentence and conviction, the Supreme Court of New Jersey found that the trial court's decision to

hold the trial in Mercer County using a foreign jury, rather than ordering a change of venue, did

not deprive Harris of a fair trial because the use of a foreign jury is "one of the trial management

techniques specifically approved to ensure that a defendant's right to an impartial jury is not

compromised."  Harris I, 716 A.2d at 470.

Harris contends that the New Jersey Supreme Court's conclusion, that a change of venue

was not the only way to ensure a fair trial, is contrary to clearly established Supreme Court

precedent.  Harris maintains that, in light of the prejudicial pretrial publicity, a change of venue is

the only thing that would have guaranteed him a fair trial.  However, Harris has provided no

_____

[7] Burlington County was selected after the Appellate Division ruled that the trial court's
initial choice of Hunterdon County, which was selected based on newspaper circulation data, was
inappropriate because it failed to take into account racial demographics.  See State v. Harris, 660
A.2d 539 (N.J. App. Div. 1995).

Supreme Court authority to support his position.

The Supreme Court has dealt with the Fourteenth Amendment's guarantee of due process and the Sixth Amendment's guarantee of a fair trial in the face of prejudicial pretrial publicity on several occasions.  The clear message of these cases, however, is not that when faced with prejudicial pretrial publicity, a change of venue is the only way to guarantee a fair trial; rather, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961); accord Murphy v. Florida, 421 U.S. 794, 799 (1975); Patton v. Yount, 467 U.S. 1025, 1035 (1984).  The focus of the Supreme Court's cases is thus on the impartiality of the jury that is impaneled, not on the trial management devices used, or not used, by the trial court in ensuring the impartiality of the jury.  See Groppi v. Wisconsin, 400 U.S. 505, 509 (1971) ("There are many ways to try to assure the kind of impartial jury that the Fourteenth Amendment guarantees.").

In Irvin, the Supreme Court found that the defendant's Fourteenth Amendment due process rights had been violated when, on account of a state statute, the trial court refused to grant a second change of venue, even though eight out of the twelve jurors on the panel believed that the defendant was guilty before hearing any evidence.  Irvin, 366 U.S. at 728.

Similarly, the Supreme Court found that a defendant's Fourteenth Amendment due process rights had been violated when two impaneled jurors were deputy sheriffs from the community and that three jurors had admitted to having seen a television interview in which the defendant gave a detailed confession that had been repeatedly broadcast on the local news. Rideau v. Louisiana, 373 U.S. 723 (1963),   On the basis of these facts, the Supreme Court found that the trial court should have ordered a change of venue.

In both of these cases, the defendants did not receive fair trials because the juries were not impartial, not because their requests for a change of venue were denied.  The Supreme Court's holdings are grounded in notions of due process and a defendant's right to receive a fair trial by an impartial jury.  A change of venue is merely one way to remedy inherently prejudicial pretrial publicity and ensure that a defendant receives a fair trial.

In its later cases, the Supreme Court continued to develop the theme that a defendant's rights to a fair trial hinge on the impartiality of the seated jury.  In Murphy v. Florida, 421 U.S. 794 (1975), the Court concluded that, despite the pretrial publicity, the defendant had not been denied a fair trial, even though some members of the jury had learned from news accounts about a prior felony conviction and certain facts about the crime with which the defendant was charged. The Court found that the voir dire "indicate[d] no . . . hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." Id. at 800.  In Patton v. Yount, 467 U.S. 1025 (1984), the defendant's confession to the crime was submitted as evidence at trial, but was subsequently found to be unconstitutional and the defendant was granted a new trial.  Despite the media attention that the first trial received, the Supreme Court found that the defendant's second trial was fair because the lapse in time between the first and second trials had lead the community to lose interest in the case and the record did not suggest that the seated jurors could not be impartial.  Id. at 1034-35.  Finally, in Mu'Min v. Virginia, 500 U.S. 415 (1991), the Supreme Court concluded that the trial judge was the primary arbiter of a potential juror's impartiality and that, ultimately, the trial court must decide whether "this juror [is] to be believed when he says he has not formed an opinion about the case" and can weigh the facts

impartially.  Id. at 425.[8]

In this case, the trial court adhered to Supreme Court precedent by acting to ensure that

Harris received a fair trial by an impartial jury.  Recognizing that pretrial news reports were

highly prejudicial, the trial court concluded that it would be difficult to impanel an impartial jury

from Mercer County.  Motivated by Harris's right to an impartial jury, the trial judge brought in a

venire from neighboring Burlington County, where the Trentonian and the Trenton Times had a

combined circulation of approximately 20,000 subscriptions—far fewer than in Mercer County.

All of the potential jurors from Burlington County completed a nineteen page juror

questionnaire, which included detailed questions about past and current residences, news sources,

and prior knowledge of facts of the case.  Any venireman who had a subscription to, or regularly

read, the Trentonian was excused for cause.  The final question asked whether the venireman had

formed any opinions about the case, and if so, to explain.  The trial court conducted the voir dire

itself, following a consistent pattern of questioning.  The trial court also explained the

presumption of innocence and the need for impartiality and asked the potential jurors whether

there was anything that would substantially impair their ability to render a fair verdict.[9]

---

[8] Harris also relies on Estes v. Texas, 381 U.S. 532 (1965), and Groppi v. Wisconsin, 400
U.S. 505 (1971), to support his argument that his constitutional rights were violated by the trial
court's failure to order a change of venue.  These cases are inapposite and only augment the line
of precedent holding that a defendant's right to a fair trial is satisfied when he is tried by a panel
of impartial, indifferent jurors.  In Estes, the Supreme Court dealt with the intersection of the
First Amendment's guarantee of free press and the Fourteenth Amendment's guarantee of due
process.  In Groppi, the Supreme Court struck down a state law prohibiting change of venue in
misdemeanor cases, holding that "under the Constitution a defendant must be given an
opportunity to show that a change of venue is required in his case."  400 U.S. at 511.  There is no
question in this case that Harris was afforded an opportunity to argue for a change of venue.

[9] These details are taken from a "Sample Jury Questionnaire" and the "Trial Judge's
Topical Outline for Court-Conducted Voir Dire," which were submitted as part of the State of

There has been no suggestion that the jury itself was prejudiced against Harris. As required by the Sixth and Fourteenth Amendments, the jury was "drawn from a community of people who had [not been exposed to inherently prejudicial pretrial publicity]," Rideau, 373 U.S. at 727, and their verdict was "based upon the evidence developed at trial," not on preconceived beliefs of guilt. Irvin, 366 U.S. at 722. Nothing required the trial court to order a change of venue[10] or do anything other than ensure that Harris received "a fair trial by a panel of impartial, indifferent jurors." Id. Because there is no reason to doubt the trial court's judgment as to the impartiality of the jury, there is no basis for finding a constitutional violation. See Mu'Min, 500 U.S. at 425-427. The trial court's refusal to grant Harris's request for a change of venue did not amount to a denial of his constitutional rights. See Martin v. Warden, 653 F.2d 799, 804 (1981). Accordingly, the New Jersey Supreme Court's conclusion affirming the trial court's use of a foreign jury is not contrary to, or an unreasonable application of, Supreme Court precedent.

**C. Ensuring Impartiality of the Jury**

Similar to his first argument, Harris asserts that the trial court violated his Sixth and Fourteenth Amendment rights by failing to take strong measures to ensure that the jury was not influenced by the media during the trial. Specifically, Harris argues that the trial court should

_____

New Jersey's Appendix filed with its brief in response to Harris's appeal from his sentence and conviction. No transcript of the voir dire has been provided, but there is no reason to doubt that all of the jurors completed the questionnaire or that the trial court followed its topical outline.

[10] Although the Supreme Court's precedent does not mandate a change of venue as the sole remedy for prejudicial pretrial publicity, it is now required by the State of New Jersey. In Harris I, the New Jersey Supreme Court held that, hereafter, whenever "there is a reasonable likelihood that the trial of a capital case will be surrounded by presumptively prejudicial media publicity . . . [or] a court is satisfied that there is a reasonable likelihood of the continuing recurrence at a capital trial of presumptively prejudicial publicity that might infiltrate the trial," then a change of venue is required. 716 A.2d at 463.

have done more to prevent jurors from coming into contact with the Trentonian, which could be found in and around the courthouse, and that the trial court should have questioned the jurors individually throughout the trial about their exposure to the media coverage.  The New Jersey Supreme Court found that the trial court's general questioning of the jury, which revealed that no exposure had occurred, was acceptable.  Harris I, 716 A.2d at 473-74.

Relying on Sheppard v. Maxwell, 384 U.S. 333 (1966), and Nebraska Press Association v. Stuart, 427 U.S. 539 (1976), Harris contends that the New Jersey Supreme Court's decision was an unreasonable application of clearly established federal law.

In Sheppard, the defendant, a doctor, was accused of murdering his pregnant wife.  The case was covered extensively by the media and journalists crowded the courtroom and the courthouse.  The Court found that the defendant's due process rights had been violated because the trial court failed to take "strong measures" to ensure that the defendant received "a trial by an impartial jury free from outside influences."  Sheppard, 384 U.S. at 362.  Accordingly, the Court found that the trial court had not fulfilled its duty to protect the defendant from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom.  Id. at 363.

In Nebraska Press, the Supreme Court was faced with the question of whether an order restraining the media from publishing or broadcasting reports suggesting the defendant's responsibility for a widely reported murder violated the First Amendment.  In reaching the conclusion that the order did violate the First Amendment, the Court summarized its Sixth Amendment precedent, recognizing that freedom of the press must be balanced against a defendant's right to a fair trial by an impartial jury.  The Court reiterated its holding in Sheppard,

that the trial court must take strong measures to protect a defendant's due process right to a fair

trial, 427 U.S. at 553, but ultimately found that the trial court failed to consider whether other

measures would have insured the defendant a fair trial, 427 U.S. at 563.

Neither of these cases, however, establish that the New Jersey Supreme Court's decision

was an unreasonable application of clearly established federal law.  Indeed, Supreme Court

precedent demonstrates that "pre-trial publicity—even pervasive, adverse publicity—does not

inevitably lead to an unfair trial."  Nebraska Press, 427 U.S. at 554; see also Murphy, 421 U.S. at

799.  As the "problem of pervasive media publicity" has become more frequent in the trial of

sensational criminal cases, Patton, 467 U.S. at 1031, trial courts have adopted certain practices to

protect the defendant's right to a fair trial, including "searching questions of jurors . . . to screen

out those with fixed opinions as to guilt or innocence; . . . the use of emphatic and clear

instructions on the sworn duty of each juror to decide the issues only on evidence presented in

open court[;] . . . [and] limit[ing] what the contending lawyers, the police, and witnesses may say

to anyone," Nebraska Press, 427 U.S. at 564 (citing Sheppard, 384 U.S. at 357-62).

In this case, after drawing the venire from a neighboring county, the trial court conducted

a searching voir dire, which ensured that subscribers and regular readers of the Trentonian were

not impaneled.  Throughout the trial, the court collectively questioned the jurors regarding their

exposure to media reports on the trial and regularly instructed the jury not to read or watch any

accounts of the trial.  The trial court also imposed a gag order which prevented counsel from

speaking to the press about the case.  Despite the presence of newspapers in and around the

courthouse, there has never been any suggestion that any juror reached a conclusion as to Harris's

guilt that was not based on evidence adduced at the trial.  Given the precautions taken by the trial

court and the lack of indication of individual juror bias, there is no basis for concluding that the

trial court did not fulfill its duty to ensure that Harris was tried by an impartial jury.

It is not enough that jurors were in an atmosphere where they might have been exposed to

some media coverage of the trial.  Not only would it be "virtually impossible to shield jurors

from every contact or influence that might theoretically affect their vote," Smith v. Phillips, 455

U.S. 209, 217 (1982), but, more importantly, the "Constitution does not guarantee trial by jurors

totally oblivious to events unfolding from day to day in the community in which they live."

Martin, 653 F.2d at 806.  Nor does the Constitution not require that "jurors be totally ignorant of

the facts and issues involved" in order to render an impartial verdict.  Irvin, 366 U.S. at 722; see

also Martin, 653 F.2d at 806 ("A juror's ignorance may not be expected; only a juror's

impartiality can be assured.").  "To hold that the mere existence of any preconceived notion as to

the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a

prospective juror's impartiality would be to establish an impossible standard."  Irvin, 366 U.S. at

723.  A "juror may still sit if able to set aside any preconceived notion and render a verdict based

on the evidence presented in court."  Martin, 653 F.2d at 806.  Indeed, it is for the trial judge to

decide whether a juror is "to be believed when he says he has not formed an opinion about the

case."  Mu'Min, 500 U.S. at 425.  Here, as in Murphy, the trial court's collective voir dire of the

jury raised no suggestion of hostility towards Harris or a loss of impartiality.  See Murphy, 421

U.S. at 800.  Accordingly, the New Jersey Supreme Court committed no constitutional error in

affirming the methods for maintaining juror impartiality used by the trial court.

**D.  Allegations of Juror Contact**

Harris also argues that his due process rights were violated because the PCR court refused

14

to hold a hearing to investigate allegations that a disgruntled former public defender was talking to jurors during Harris's trial.  As defense counsel was preparing for the PCR hearing, he was informed by his investigator that Sergeant Petro, a bailiff at Harris's trial, had observed Audrey Bosme, a former public defender, speaking to jurors in the hallway during a trial recess.  Defense counsel also learned that on the same day, Bosme had been removed from the Mercer County Jail because it was discovered that she was using her old ID card to gain access and interview inmates about Harris.  Sergeant Petro later denied that he had seen Bosme talking with jurors, however he maintained that she was subsequently banned from attending the trial.  Yet, it is not clear who prohibited her attendance or for what reason.

The PCR court refused to hear testimony from Sergeant Petro, Bomse, or defense counsel's investigator and denied a motion to interview jurors regarding the alleged contact with Bosme.  Affirming the PCR court's conclusion that Harris had not shown good cause for post-verdict juror interrogation, the New Jersey Supreme Court observed that there was no evidence that jurors had considered inappropriate information or that Harris had been harmed by juror misconduct in any way.  Harris III, 859 A.2d at 431.

Harris submits that the New Jersey Supreme Court's conclusion was contrary to and an unreasonable application of Supreme Court precedent.  Citing Remmer v. United States, 347 U.S. 227 (1954) and Smith v. Phillips, 455 U.S. 209, 215 (1982), Harris argues that the circumstances suggest that jurors may have been influenced by Bosme's improper contact and that the PCR court clearly violated his right to due process by failing to grant him a hearing at which he could have shown actual prejudice.

In Remmer, the Supreme Court held that "[i]n a criminal case, any private

15

communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . deemed presumptively prejudicial." 347 U.S. at 229.  In Smith, after it was discovered that one of the jurors had submitted an application to the prosecuting district attorney's office, the Supreme Court refined its position on external influences, holding that, rather than presuming prejudice, "the remedy for allegations of juror impartiality is a hearing in which the defendant has the opportunity to prove actual bias." 455 U.S. at 215.

Even though the Supreme Court has established a rule that a criminal defendant must be given an opportunity to prove juror bias by an extraneous influence, see Tanner v. United States, 481 U.S. 107, 126-27 (1987); Nevers v. Killinger, 169 F.3d 352, 373 (6th Cir. 1999) ("It is a matter of clearly established Supreme Court precedent that a criminal defendant claiming implied juror bias is entitled to the opportunity to prove actual bias."), the New Jersey Supreme Court's denial of a post-verdict hearing was not contrary to, or an unreasonable application of, Supreme Court precedent because Harris has presented no evidence that any of the jurors received extraneous information from Bosme.  "Where there is affirmative reason to believe that a member or members of the jury may have learned extra-record information . . . that has a potential for adversely affecting the jury's ability to impartially decide the case on the record evidence alone, the trial court has a duty to determine whether the trial should be aborted . . . ." Government of Virgin Islands v. Dowling, 814 F.2d 134, 138 (3d Cir. 1987).  There was no reason for the PCR court to believe that any member of Harris's jury received prejudicial external information; all that was presented in support of Harris's motion for an evidentiary hearing was Sergeant Petro's statement, which he later denied making.  See also Nevers, 169 F.3d at 373

("When a trial court is presented with evidence that an extrinsic influence has reached the jury

which has a reasonable potential for tainting that jury, due process requires that the trial court

take steps to determine what the effect of such extraneous information actually was on that

jury.").

        In Remmer, a juror informed the trial court of an attempted bribe and in Smith, the trial

court was made aware of a juror's employment application.  In Dowling, the trial court received a

note stating that the jury had learned additional facts about the case that were not presented at

trial.  In these cases, juror misconduct was unquestionably established and further investigation

was necessary in order to determine whether the misconduct would impair the jury's ability to

render an impartial verdict.  Here, there is no evidence of juror misconduct–only speculation.

Accordingly, there was no constitutional error in the PCR court's denial of Harris's request for an

evidentiary hearing.

### E.   Testimony of Anthony Boone

        Harris next argues that his constitutional right to present a defense was violated when the

trial court refused to permit Anthony Boone from testifying that Gloria Dunn was a violent

person.  Gloria Dunn, the state's primary witness and Harris's accomplice in the Huggins

murder, and Anthony Boone have a child together.  If allowed, Boone would have testified that

Dunn was a violent person in an attempt to establish that Dunn was not a docile young woman

and undermine the prosecution's theory that Harris was Huggins's killer.  The trial court did not

permit Boone's testimony on several grounds, including that Dunn's character for violence was a

collateral issue and that Dunn's relationship with Boone had ended at least one year before the

murder.  The New Jersey Supreme Court affirmed, finding that Boone's testimony had little

probative value to show that Dunn had been violent on this occasion.  Harris I, 716 A.2d at 486.

Under the Sixth Amendment, a criminal defendant must be given a "meaningful opportunity to present a complete defense."  Crane v. Kentucky, 476 U.S. 683, 690 (1986). Indeed, the Sixth Amendment's Confrontation Clause ensures that criminal defendants are not prevented from introducing competent, reliable evidence that has a direct bearing on the defendant's claim of innocence.  See id.  However, this right is not absolute, nor is it broad enough in this case to trump a state court's rules of evidence.  See, e.g., Alexander v. Shannon, 163 Fed. Appx. 167, 174 (3d Cir. 2006).  Aside from this general principle, Harris has provided no Supreme Court precedent that contradicts the New Jersey Supreme Court's conclusion. Despite the denial of Boone's testimony, there is no suggestion that Harris did not receive a meaningful opportunity to present a complete defense.  Accordingly, Harris's constitutional rights were not violated by the trial court's ruling.

## F.   Effective Assistance of Counsel

Finally, Harris argues that he was denied his Sixth Amendment right to effective assistance of counsel.  Harris claims that his counsel was ineffective by failing to effectively cross examine Tariq Ayers, Harris's 14 year-old cousin and a key witness for the prosecution. According to Harris, defense counsel should have confronted Ayers with his statement to a defense investigator that he had been beaten by a police officer during an interrogation and coerced into implicating Harris.  Harris also claims that his counsel was ineffective for calling Mary Jo Ranfone and Carmen Castellano to testify that Harris was seen driving a small red car down Cortland Street in Trenton with a young female passenger around 11:00 am on the day of the murder.  Harris submits that defense counsel's decision to present these two witnesses was a

18

serious error because no other witness, except for Dunn, claimed to have seen Harris and

Huggins together.

Ineffective assistance claims are governed by the two-part test adopted by the Supreme

Court in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a habeas petitioner

must show that his counsel's representation fell below an objective standard of reasonableness,

id. at 688, and that he was prejudiced by his counsel's deficient performance, id. at 694.

Prejudice is established by showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Id.  When

assessing ineffectiveness claims, courts "must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance" so as to not "second-

guess counsel's assistance after conviction." Id. at 689.

Harris has not overcome this presumption of reasonableness.  Harris's trial counsel

testified before the PCR court and explained that he did not use a report indicating that Ayers had

changed his statement and that his testimony may have been coerced because he had serious

concerns about the reliability of the report and there was no corroborating evidence of coercion.

Counsel did however attack Ayers's credibility on a number of other points in a cross-

examination that the New Jersey Supreme Court characterized as "devastating." Harris I, 716

A.2d at 489.  Counsel further explained that the purpose of Ranfone's and Castellano's testimony

was to undermine Dunn's credibility and challenge her account of the events.  According to

Dunn, Huggins would not have been alive at 11:00 am and was never in the passenger

compartment of the car on Cortland Street.  The defense strategy was not to deny that Harris had

been in the car with Huggins, but rather to raise reasonable doubt that he had raped and murdered

19

her.

The New Jersey Supreme Court found that the trial record refuted Harris's claims of his

counsel's unreasonableness and denied his ineffectiveness claim under the New Jersey equivalent

to Strickland.  Harris III, 859 A.2d at 395, 397.  Indeed, there is no question that trial counsel's

performance was well within the range of reasonable professional assistance.  Every decision that

defense counsel makes has some impact on the outcome of the trial, but it is not enough for

Harris to "show that the errors has some conceivable effect on the outcome of the proceeding."

Strickland, 466 U.S. at 693.  Harris must show that he was prejudiced by his counsel's

objectively unreasonable actions.  He has failed to make such a showing here.  Accordingly, the

New Jersey Supreme Court's decision that Harris was not deprived of his Sixth Amendment right

to effective assistance of counsel was not contrary to, or an unreasonable application of,

Strickland.

### III.  CONCLUSION

For the reasons set forth above, Harris has not established that any of the conclusions of

the New Jersey Supreme Court were contrary to, or an unreasonable application of, the clearly

established precedents of the Supreme Court of the United States.  Accordingly, his § 2254

petition for a writ of habeas corpus will be denied with prejudice and this Court denies a

certificate of appealability.  The Court will enter an order implementing this opinion.


                                            s/ Anne E. Thompson
                                    ANNE E. THOMPSON, U.S.D.J.


Dated: March 2nd , 2009